FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Jul 01, 2024

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 1:24-CR-02027-SAB-2 |
| Plaintiff, | No. 1:24-CR-02027-SAB-20 |
| v. | ORDER DENYING WITH LEAVE TO RENEW DEFENDANTS' MOTION TO MODIFY CONDITIONS OF RELEASE |
| RIGOBERTO ESCOBEDO GONZALEZ, MARIA ESPERANZA HERMOSO et al., | |
| Defendants. | **ECF Nos. 374, 375** |

On Tuesday, June 11, 2024, the Court conducted a hearing on Defendants' Motion to Modify Conditions of Release (ECF No. 374). Defendant Rigoberto Escobedo Gonzalez was represented by court-appointed attorney Andrew Wagley. Defendant Maria Esperanza Hermoso was represented by court-appointed attorney Christine Bennett. Assistant United States Attorney Caitlin Baunsgard represented the United States.

ORDER - 1

1  Defendants request the Court issue an order that allows them to
2  communicate with one another so long as they do not discuss the pending case.[1]
3  ECF No. 374.  The United States Attorney's Office and the United States
4  Probation/Pretrial Services Office both object to Defendants' request.

**Marital Communication Rights of Pretrial Defendants**

6  The Supreme Court "has long held the right to marry is protected by the
7  Constitution." *Obergefell v. Hodges*, 576 U.S. 644, 645 (2015).  It has further held
8  that there is "a constitutionally protected marital relationship in the prison
9  context." *Turner v. Safley*, 482 U.S. 78, 96 (1987).  That said, "[t]he right to
10 marry, like many other rights, is subject to substantial restrictions as a result of
11 incarceration." *Id*. at 95.  And while some restrictions on inmate-spouse contact
12 have been found to be unconstitutional, this Court previously noted that a majority
13 of those cases dealt with supervised release, which is inapposite to pretrial release
14 where the judicial officer has a duty to prevent obstruction of the ongoing criminal
15 case.  *See e.g.*, *United States v. Chong*, 217 F. App'x 637, 638–39 (9th Cir. 2007);
16 *see* 18 U.S.C. § 3142(f)(2)(B) (stating that a judicial officer shall hold a detention

---

[1] Special Condition No. 3 prohibits Defendant Hermoso from contacting codefendants or witnesses, including her husband Defendant Gonzalez.  ECF No. 206.  Defendant Gonzalez has likewise been ordered not to contact such individuals, including his wife Defendant Hermoso.  ECF No. 338.

ORDER - 2

hearing in cases that involve a serious risk that a defendant will "attempt to obstruct justice").  Indeed, many courts, including the Western District of Washington, have restricted spousal communication within a pretrial context.  *See e.g.*, *United States v. Valdez-Sanudo*, No. CR20-0217-JCC, 2021 WL 1376954, at *2 n.2 (W.D. Wash. Apr. 12, 2021) (noting that defendant's codefendant wife was released on condition of no contact with defendant); *United States v. Martinez*, No. 421CR00107SMRHCA12, 2021 WL 4169789, at *1 (S.D. Iowa Sept. 13, 2021) (collecting cases noting the same).

In *United States v. Martinez*, a husband and wife were indicted as codefendants for drug-related charges, including conspiracy to distribute a controlled substance.  *Martinez*, 2021 WL 4169789 at *1.  Both defendants were released on conditions, including that they not have contact with one another, and the husband moved to have the conditions modified so that they could live together.  *Id*.  His request was ultimately granted in part and denied in part, with the court holding that the spouses could communicate, but only about matters unrelated to the case.  *Id*. at *3.  In reaching this conclusion, the *Martinez* court considered (1) the couple's shared minor child, (2) the length of their marriage, and (3) the Government's interest in preventing collusion; witness tampering; and further criminal offenses.  *Id*. at *2.

ORDER - 3

**Communication Between Defendants Gonzalez and Hermoso**

While the case is not binding on this Court, the differences between the facts of *Martinez* and the present case are striking. First, Defendants do not share a child, and Defendant Gonzalez remains in custody; therefore, the *Martinez* court's concerns regarding childcare and parents running into each other at a child's events are not present here. *See id*. Second, Defendants were married for less than six months when they were indicted (although the alleged criminal offense conducts dates back further, as do their phone conversations), while the *Martinez* defendants had been together for over 13 years.[2] *See id*. Finally, the Government's interests

---

[2] Furthermore, Defendant Gonzalez was already incarcerated when the marriage took place and, in fact, was already married when he first began communicating with Defendant Hermoso. ECF No. 438 at 3–4 (Defendant Gonzalez "brags" to Defendant Hermoso on a prison phone call about being a high-ranking member of Nuestra Familia and later asks Defendant Hermoso to send money to his then-wife). This Court is not an ecclesiastic court. It would not normally concern itself with the details of a defendant's marriage, but here the details matter. ECF No. 438 at 7 ("there must be *fact specific* [sic] individualized findings ensuring the least restrictive prohibitions are being implemented by the court") (emphasis in original). The gravamen of the Government's charges are precisely that these two Defendant conspired together to commit crimes. In this context, there is perhaps some irony that Defendants now decry a proscription on spousal contact by invoking the sanctity of their present

ORDER - 4

in preserving its case and preventing further criminal offenses are much more clearly presented in this case than in *Matinez*.

In *Martinez*, the court found that the Government's interests were reasonably at stake because some of the alleged criminal activity took place in the defendants' shared home and because the wife made an incriminating statement to law enforcement, thus heightening the risk that her husband would attempt to influence her testimony. *Id*. In the present case, Defendant Gonzalez is alleged to have participated in a conspiracy that included circumventing telecommunications monitoring in order to facilitate the introduction of controlled substances into correctional facilities, while both Defendants are alleged to have engaged in a conspiracy to launder the proceeds from those activities. This presents a much stronger nexus between the alleged criminal activity and spousal communication than was present in *Martinez*. Counsel for Defendant Hermoso contended that her client was simply an unwitting pawn caught in an excessively wide net cast by the Government during its investigation; however, the contents of Defendant Hermoso's supplemental briefing belie this notion.

On June 24, 2023—one day after Defendant Gonzalez boasted to her about being a high-ranking member of Nuestra Familia—Defendant Hermosa was

---

marriage, while many of their communications at issue occurred during Defendant Gonzalez's prior marriage.

ORDER - 5

provided with $3,000 and told to transfer $1,800 to a separate account for the purpose of Defendant Gonzalez obtaining a cellphone,³ which she did. ECF No. 438 at 4. Including that transaction, Defendant Hermoso transferred money on Defendant Gonzalez's behalf on three separate occasions in the last week of June. *Id*. On July 2, 2023, Defendant Gonzalez told Defendant Hermoso that he wanted Walla Walla (presumably meaning Washington State Penitentiary) to "start producing" (presumably meaning to start generating income through criminal activity) and inquired as to whether Defendant Hermoso knew anything about drones, to which she replied, "I can only imagine what you need that for." *Id*. Counsel for Defendant Hermoso contended that this statement demonstrated her client's ignorance as to Defendant Gonzalez's criminal activity while incarcerated. This assertion, however, strains credibility to the breaking point: this Court is unaware of any vocational or recreational drone programs within the Bureau of Prisons, and the idea that Defendant Hermoso imagined said drone would be used for anything other than illegal activity is dubious to say the least.

In that same conversation on July 2, Defendant Hermoso inquired as to why there was so much money in their Cash App account, but Defendant Gonzalez refused to explain. *Id*. at 4–5. Despite this refusal, Defendant Hermoso complied

---

³ To state what is obvious to all, including Defendant Hermoso, a cellphone is contraband in a correctional facility.

ORDER - 6

with Defendant Gonzalez's subsequent instructions to transfer over $1,200 to two separate accounts. *Id.* at 5. Two days later, on July 4, 2023, Defendant Gonzalez instructed Defendant Hermoso to withdraw $2,269 from their Cash App account and also sent her a document titled "Duties and Responsibilities" of Nuestra Familia with instructions for her to provide it to his sister.[4] *Id.* That same day, Defendant Gonzalez instructed Defendant Hermoso to follow up on a $13,500 sum he was owed (he later explained this money came from lending an individual $7,500 with an expected profit of $6,000). *Id.*

In summary, Defendant Hermoso knew Defendant Gonzalez was an incarcerated member of a notorious prison gang,[5] but continued to follow his instructions regarding transferring thousands of dollars between multiple accounts, (even after he refused to disclose the origin or purpose of the funds). Considering Defendants' conversations about his active gang status, her knowledge of drones, the procurement of cell phones, and the repayment of loans with exorbitant interest

---

[4] Defendant Hermoso asserts that she never read this document, but this is a distinction without a difference, especially if she did in fact deliver the document or knew what it was.

[5] *See* ECF No. 438 at 3 ("[Defendant Hermoso acknowledges that she's heard of [Nuestra Familia] when [Defendant Gonzalez] asks if she's heard of it" during a prison call).

ORDER - 7

rates (the principal of which was reportedly "in the street"), the contention that she was ignorant as to the illegal source of the funds or that their use in a correction facility would be to further criminal conduct is simply absurd. Based on this record, the Court continues to harbor serious and profound concerns that communication between Defendants will lead not only to obstruction, but possibly continued criminal activity as well.

In addition to those concerns, the Court must also consider the danger to potential witnesses and other individuals. As the Court previously noted, the United States proffered that a defendant in a related case discussed stabbing a suspected informant within one of the local jails. Case No. 1:24-cr-2030-SAB-1, ECF No. 16 at 4. This presents not only a risk of obstruction and danger to witnesses and informants,[6] but also any other individuals in the community or correctional facilities who may be harmed by such attempts to silence witnesses, including corrections officers and members of law enforcement.

As a final matter, the Court would consider modifying the condition to permit contact if there is a feasible way for all of the communications between Defendants to be monitored, recorded, and presented to the Court upon the request of United States Probation/Pretrial Services. This mirrors the remedy in *Martinez*,

---

[6] The individual that was to be stabbed was in fact not an informant, highlighting the risk that is posed to the community generally.

ORDER - 8

where the court ordered that the defendants would "upon request of the United States Probation Office . . . provide records of any electronic communications with each other." *Martinez*, 2021 WL 4169789 at *3.

Accordingly, **IT IS ORDERED:**

1. Defendant's Motion to Modify Conditions of Release (**ECF Nos. 374, 375**) is **DENIED**.

2. Defendants shall continue to have no contact with one another.

**IT IS SO ORDERED.**

DATED July 1, 2024.



_____
ALEXANDER C. EKSTROM
UNITED STATES MAGISTRATE JUDGE

ORDER - 9